Thank you, Your Honor. May it please the Court, my name is Evan Hiller. I'm representing the State of Arizona. I would like to spend about ten minutes right now dealing with the issue of preemption, which the State and the City of Glendale have appealed. I'd like to preserve the remainder of our time, both for rebuttal on the issue of preemption, and for my colleague, Ms. Moog, who represents the City of Glendale, to address the cross-appeal issues of constitutional law. Now, which are you going to do? We're not going to separate. Just use your time. So you're going to – both of you will argue now, and who's saving time for rebuttal? I'm going to be the only one arguing now, Your Honor, and then I'll step aside and the rebuttal time will be shared. All right. And you're going to argue for ten minutes? Yes, sir. All right. Your Honors, I think that the easiest way to approach this case is through the rubric of Williamson v. Mazda Motors of America. This is a classic obstacle preemption case, and Mazda is the most recent profound Supreme Court statement on that issue. And in Mazda, the Supreme Court considered a situation where a State tort law statute essentially constrained the choice given to automobile manufacturers under Federal law between two types of seatbelt devices and penalized the use of one of those two devices. And so the discretion of the automobile manufacturers under the State law regime was essentially cut in half. Although the purpose of the statute was essentially to protect the consumers, and what the State did was to give them additional protection. Yes, Your Honor. The purpose of this statute is not one that I think has been represented well by the Nation in their briefing. This statute is not intended to give the Nation any particular parcel they desire. It certainly isn't intended as the object of the statute to give them this parcel in Glendale for gaming purposes. And it's important to draw a line between frustration of the Nation's plan for this particular plot of land and frustration of Congress's purposes. Well, pardon me, counsel. Pardon my voice. It is true that Congress carved out certain types of property. And in our recent case, we've indicated what is and isn't included within the definition of, let me see the exact wording, the phrase within the corporate limits. That's now been defined. Yes, Your Honor. And that includes the property issue here. Is there any serious contention on the part of the State or the City that HB 2534 was passed for any reason other than to frustrate what the tribe wanted to do in this case? Yes, Your Honor. There are no reasons. I'm interested to hear that, because I don't see how you make that case. But let's hear it. Your Honor, I'm not as well acquainted with this issue as my colleague, but I'm going to do my best because I think this speaks more to the due process. You can dance a little bit here and there if you want to. I perhaps will dance, Your Honor. Essentially, what this — what the Nation's actions in asking to have this parcel taken into trust did was alert the State to a problem with its existing zoning laws. The State of Arizona had a regime of strip annexation for many years. And what would happen is that cities would protect their borders by annexing 10-foot-wide strips of land or — And all those annexation laws gave all kinds of people rights to object and to have hearings and do all kinds of things, which are gone from the statute. Yes, Your Honor. The statute, you know, it's practically retroactive, and it's focused on one thing, and that's people trying to take advantage of the Hela Bend Act. Well, Your Honor, that's not the only way in which the statute could operate. And the problem is, is that as far as the City of Glendale knew when it annexed this land in 1977, that land was the City of Glendale's to do with as it pleased. It has land use authority over it. It has zoning authority. No other statute, no other — Help me with that. I used to practice land law for 37 years. You're telling me that the City of Glendale had the authority to do whatever it wanted for zoning on property outside of its limits? Your Honor, for interior county islands, the county islands within the outer borders of the city, the county explicitly adopts all of the city's plans. Okay, that's the county. Yes. But you're talking about the City of Glendale, right? Well, the moment the City of Glendale changes its zoning for that area, it's — then, you know, it becomes operative for that county island as well, because the county has adopted the Glendale land use plan. And forgive me. Isn't this really what Judge McKeown's opinion dealt with? I mean, in terms of what land is included within the boundary is now decided, and it's decided for purposes of the Ninth Circuit and the statute that the land in question was not included within the incorporated City of Glendale. Isn't that correct? That's correct, Your Honor. But the State's intent in continuing to allow counties or continuing to allow cities to slowly develop these interior islands that were created before about 1980 and that the State statute specifically exempts those interior islands from new rules about sort of minimum size, about creating new county islands, they were designed to allow infill. That may have been the protocol, and I don't question that, but it wasn't the law.  They didn't annex this — they didn't annex this land. It didn't belong to them. It was not within the City boundaries. And we have to construe this Federal statute, and now Judge McKeown and her panel has done so, indicating that this land was not within the City. So for your purpose, what I need to understand is, now that we know that this land is not within the City for purposes of the Federal statute, it does no good, in my judgment, to say that this land is not within the City. And you can do it if you want to, but I don't think it's good use of your time to tell us why the counties in the City had this great protocol and they could do whatever they wanted with the zoning. It doesn't matter now. For purposes of this law, it was not in the City. So the question I have for you again is, what possible use did 2534 have other than to frustrate the tribe's desire to have this land included? There are two cases, Your Honor, two situations, one of which is a discretionary land acquisition by an Indian tribe, in which case this would give the City of Glendale an additional voice, or any city that would be a discretionary land acquisition. That's if it were not included in trust, right? I'm sorry, Your Honor? That's if it were not included in the trust, that the Secretary of the Interior included it within the tribal lands? Is that what you're talking about? If there were land that's not currently in trust that a tribe wanted to acquire and was going through a discretionary trust acquisition, Glendale would get a seat at the table and they would also get Article III standing to challenge the determination, neither of which are entirely clear under current law, given this weird, is it inside the City, is it outside the City, that has obviously come down in a way that the State and Glendale would not prefer. Right. The second situation that could arise is land swaps, where there are swaps between private landowners and the federal government. And in both of those situations, what happens is that there is a new sovereign on that land. And as HB 2534 has written, this only applies to land that's either completely encircled or three-quarters encircled by the same city. Is there any other land in the State of Arizona that this fits, other than the land that we're talking about? Oh, yes, Your Honor. Where? There's plenty of land in Maricopa County that fits this description. Fits it exactly. There are county islands in those cities. Surrounded on three-thirds? Or on all four, Your Honor. This was a commonplace practice to sort of strip, annex, and then infill. And most of Arizona's cities in Maricopa County, or at least the ones in the Phoenix metropolitan area, have some sort of remaining county island shards. Why does the statute say that it only applies to land bordered on three sides? It doesn't cover land bordered on four sides. It does cover land bordered on four sides, Your Honor. It does? Either three or four. Either completely encircled or three-quarters encircled.  Can you tell me why the discriminatory burden rationale does not apply? I would love to, Your Honor. The discriminatory burden rationale is a doctrine that exists in cases where State courts are enforcing Federal laws. And it's usually Section 1983, but where you have some sort of Federally created cause of action that the State courts are not lending equal credence to or allege not to be giving the same benefits as other lawsuits. And so in that context, it makes a great deal of sense for the Court to say, is this a true neutral rule for resolving cases, or is it intended to hurt the Federal claimants? And those cases haven't been applied outside that context of State courts enforcing Federal rules, to my knowledge, Your Honor. And certainly if Felder were as powerful as the nation would have it, I think it would have been used in that way. And it hasn't been. So the discriminatory burden cases that they cite, like Nash or Lovatis or Toll, all essentially collapse to an obstacle preemption case where the real question is whether the Federal objective is frustrated by the application of the law. And so in this case, Your Honor, the Federal objective is to give the nation economically useful land,  And the State is trying to strike a balance there by giving a little bit of additional protection to cities and towns in these particular situations where their needs are most acute. And the nation is still able to acquire, at a rough estimate, Your Honor, 5 or 10 million acres of land in Maricopa County. I mean, there is a lot of land there that is not affected by this. And their choices are far, far less constrained than was found acceptable in Mazda. Your Honor, the last argument I'd like to address very briefly before I step down is the issue of this eligibility freeze that appears in the district court's opinion, where Judge Campbell concluded that the word is in the Hila Bend statute essentially fixed the date of eligibility for that parcel at the date the application was made to Interior. And that's simply not in keeping with Interior's own internal rubrics for when rights best or for when transfers are complete. And given the presumption against preemption, I think it's a difficult reading to reach when there are simple readings that would allow for greater flexibility. And particularly in cases like this, where Congress has made something turn on a fact of state law. Congress obviously knew that that law could change. I have one question for you, if, arguendo only. If we disagree with you about your view of preemption, do we even need to reach the equal protection argument or the due process argument or the special legislation argument? Your Honor, if you – I know it's just arguendo, that's all it is. I'm just asking hypothetically here. Your Honor, we won those issues, so I don't think there's any reason to reach them either way. I think you should rule in our favor on those issues. Okay. Thank you. And I'd like to reserve the remainder of our time. I'd like to reserve our time for rebuttal. Good morning. Danielle Spinelli for the Tohono O'odham Nation. With the Court's permission, I'd like to reserve five minutes for rebuttal. Well, normally we wouldn't, but I guess these are cross appeals. These are cross appeals. I'm happy to abide by whatever the Court's typical practice is, though. Well, I think you're going to take care of reserving time for cross appeal? If she's cross appeal, if she wants to be cross appeal, anything. Okay. Would you save what you could use for cross appeal? I apologize. Did you find her? No. I said if you want to reserve time, it would only be for the cross appeal. Precisely. Precisely. All right. Thank you. Are you the only one arguing? I'm the only one arguing. And I'd like to start with the preemption issue. HB 2534 stands as an obstacle to achievement of the full purposes and objectives of Congress for two reasons, as the district court held. First, its purpose and effect is to thwart the Secretary's existing obligation to take the Nation's property into trust under the Lands Replacement Act. And second, it uses the Nation's invocation of its rights under the Lands Replacement Act as a trigger to deprive the Nation of rights accorded to all other Arizona landowners, impeding the Nation's exercise of its federally granted rights. Counsel, how would you distinguish the Green case, Green v. the City of Tucson, from this case? Well, the Green case, I think, goes to the equal protection argument. I believe, rather than the preemption argument, I would distinguish the Green case. I mean, Green makes clear that there is no constitutional right to any particular annexation procedure, and we don't dispute that. What there is, and what Arizona has created, is a statutory right that applies to every other landowner in the State, under which they have the right to vote on whether their land can be annexed. Here, all those rights have been taken away from the Nation, and its land can be annexed unilaterally without its consent. That's true of no other landowner under this law. All right. Let's leave the equal protection argument, then. And how does the Kelovin Act create a Federal right to the kind of procedural protections available to landowners under Arizona annexation law? It doesn't. That those rights are a creature of Arizona. How does it create a right? Let me step back for a second. Our argument with respect to the fact that the HB 2534 discriminates against a Federal right is that HB 2534 uses the Nation's application for benefits under the Lands Replacement Act as a trigger to take away rights under State law that all other Arizona landowners have. It's very similar to the Supreme Court decision in Nash, under which employees who had filed unfair labor practice charges against their employer had their State law unemployment benefits terminated. That law was held to be preempted because it imposed a burden on the exercise of the Federal right to file unfair labor practice charges, and thus disrupted and impeded the operation of the Federal scheme. That's exactly what we have here. The State of Arizona has decided to penalize the Nation for taking actions it has a right to take under Federal law, and that disrupts the operation of the Federal scheme. That's one reason why this statute is preempted. The other reason, as I said, is that this statute was designed to and does thwart the Secretary's existing obligation to take land into trust for the Nation. And I think while either is sufficient, it's the combination of those two factors that really makes this an easy case. What role, if any, should the timing of this State law enactment vis-à-vis the request of the tribe to the Secretary to take the land into trust? How should we relate to that? The one occurred after the Secretary's, the Secretary had been asked to take the land into trust, is that correct? A number, was it two years or some period of time anyway? The statute was passed two years after the Nation requested that the land be taken into trust. Approximately a year after the Secretary rendered his determination that he was in fact required to take the land into trust. Glendale and Arizona, along with other parties, challenged that determination in the district court. The district court upheld it. Of course, as you mentioned, this Court upheld it. The land for all of that time has been eligible and remains eligible for trust acquisition. And in fact, it would already be in trust were it not for the fact that Glendale and Arizona and other parties had brought unsuccessful litigation challenging the the Secretary's decision. There is indeed, and I think that's quite interesting, the Department's practice, the Department of the Interior's practice at the time was to self-stay acquisitions. And it did so because at that time it took the position that the Quiet Title Act barred challenges to trust acquisitions after the land had gone into trust. Now, we now know after the Supreme Court has decided patch act that that is no longer correct, and the Department no longer abides by that policy, but at this time it did. Accordingly, it self-stayed the acquisition. In order to permit Glendale and Arizona to challenge its decision, it maintained that self-stay throughout the period of the district courts, of the district court proceedings. After the district court ruled in our favor, the government then went to Glendale and asked, will you be willing to agree not to use HB 2534 to annex the nation's property if we agree that we will not take the land into trust pending appeal? Glendale said no. The United States, therefore, declined to continue the self-stay. Glendale went to the district court, saw an injunction pending appeal, and received it, but the district court also enjoined Glendale from annexing parcel 2 because as the United States represented, and, you know, this is the United States words. In fact, this is the words of Larry Echo Hawk, who was the Assistant Secretary for Indian Affairs at the time, that annexation may frustrate the trust acquisition of parcel 2, which would be contrary to both the Lands Replacement Act's purpose and the Department's general policy of promoting Indian self-government. And as the United States noted in that filing, which I apologize is not in the excerpts of record, but is a public document on the docket of the APA litigation, the purpose of the Lands Replacement Act, and I think this goes to something Mr. Hiller said, is not simply to give the nation 9,880 acres of replacement land. Rather, the purpose of the Lands Replacement Act, as Congress itself said, is to facilitate the replacement of the nation's reservation lands with lands suitable for sustained economic development, sustained economic use, which is not principally farming, and to promote the economic self-sufficiency of the autumn Indian people. And to accomplish that end, the Lands Replacement Act gave the Tohono O'odham the ability to choose whatever land it thought would best fulfill that objective within the strictures set out by the statute. That's because the land was purchased through a straw person. Is that correct? The tribe didn't purchase the land outright. Is that correct? The land was purchased by a wholly-owned corporation called Rainier Resources, and title was then transferred to the nation several years later. The reason it was done that way, I don't believe it's in the record of this case, but it is in the record of other litigation that's ongoing, is that in the past, the nation had had significant difficulty purchasing land for a fair market price if the seller knew that it was the nation trying to purchase it. There's nothing illegal about it. I just wanted to know whether it was known. One other thing. So here we've got land purchased through basically a straw person, an affiliated straw person. We have a retroactive statute with all due respect to Justice Scalia. What are we to make, if anything, of some of the comments made by the sponsoring state legislators when the state bill was passed? I think the legislative record speaks for itself. It's crystal clear that the sole purpose of this legislation was to prevent this particular trust acquisition from going forward, and, you know, the legislators were completely open about that. And under the Wyatt v. Levine case, what role, if any, does that play, or should it play? I think the best way to think about the presumption against preemption is that it's really sort of a common-sense heuristic for discerning Congress's intent in a particular situation. And it's for that reason that one sees different formulations of the presumption in different cases. In a case where the area of law is traditionally one of State law, such as in Wyatt v. Levine, where we were talking about a State tort suit for failure to warn about the effects of a drug, then the presumption is quite strong. On the other end of the spectrum, where one has, as in Locke, a case in which the State is attempting to regulate in a space that's pretty much exclusively Federal, the presumption has little, if any, effect. And I guess the question is, on what side of the spectrum are we here? I would submit that we are at the end of the spectrum in which the State is trying to intrude into an exclusively Federal area. Now, to be sure, State land use is a traditional State area of regulation. But this statute cannot be described as a normal State land use regulation of general applicability. It applies solely to landowners who try to transfer their land to the Federal government. And, in fact, I mean, notwithstanding Mr. Hiller's argument, I think it's quite clear that it applies to Indian tribes alone, because only Indian tribes are required to submit an application pursuant to a specific Federal statute or regulation as the statute requires. I'll be interested to ask, opposing counsel, so because the statute does require to speak of the trust in the Secretary of the Interior and the like, it only applies to the Indians and, indeed, to this tribe, because this tribe was the beneficiary of the Gila Bend Act, right? That's correct. I mean, in effect, it applies only to the nation. And I think the legislative history is very clear that it was designed as narrowly as possible, specifically because there was no political will to make it apply any more broadly. There was no desire to take these rights away from any other landowners. This was focused specifically on the nation and specifically on this pending trust application. Kennedy, what role, if any, does the fact that this law eliminates many of the rights that adjacent cities, landowners and the like would have in a, in quotes, normal annexation under Arizona law? You mean the Lands Replacement Act eliminates those rights? Right. Normally, an adjacent city could object. They have certain rights, certain environmental rights, certain all kinds of rights. And in this case, it seems to me that they have been swept away so that it can be focused on this particular acquisition. And so I'm asking what, if any, role does that elimination of those more customary rights given to other annexing or opposed to annexing entities play in this case? I think that goes to the fact that Congress made a choice here to make this acquisition mandatory. Congress certainly could have made this a discretionary acquisition, in which case under the Department's regulations, surrounding jurisdictions would have had an opportunity to object. In fact, they did have an opportunity to object here, but the statute doesn't contemplate or permit the Secretary to do his own discretionary balancing of tribal interests against municipal interests. That balancing has been done already by Congress. And it's that balance that HB 2534 is effectively trying to change. Yeah. The law says the Secretary shall. Correct. Certify, right?  If it meets the requirements. And now we have our Court's case that says that this land was not within the incorporated territory of Glendale. Correct. Exactly so. And what's happening is that the City and State are making use of the delay that was caused by their challenge to the Secretary's determination in order to try to change the State law status of that land and thereby, as the United States said, frustrate the purpose of the Lands Replacement Act. And so I think this is a quite clear case of obstacle preemption. Unless the Court has further questions, I'll reserve the remainder of my time. Thank you. Thank you. Your Honors, I wanted to start by addressing the timing issue. Can I ask you first on what Judge Smith has referred to as Judge McEwen's case? I don't recall the name of it at the moment. Has the State or the City filed a petition for rehearing? Yes, Your Honor. The State and City have filed a petition for rehearing, which is pending a decision following the Court receiving a response from the nation. Thank you, counsel. Your Honors, when the initial parcel application was made was in, I believe, January of 2009. And the Secretary, ignoring entirely litigation, the Secretary had not reached a decision by spring 2010, at which point the nation filed a lawsuit to try and force the Secretary to speed it up. And by the time that was resolved, no decision was reached until, I think, August of 2010. So there was already more than a year and a half of time, and that was not delay caused by the City or the State. That had nothing to do with the City and the State. That was entirely interior. And, Your Honor, I think that the issue of timing is actually illustrative of a lot of what's going on in this case. The nation signed a new compact for gaming in late 2002, December 2002 or January 2003 is when the compacts became finalized. They immediately bought this land in 2003, and then they sat on it for six years. This wasn't a matter of wanting to avoid getting hit with some sort of surcharge because they were an Indian tribe buying land. This was an attempt to conceal the ownership of that land. And the nation sat on that land without disclosing its ownership for six years. Do you have anything on the record that shows active side enter on their part of trying to conceal the land? Your Honor, the timing is on the record. Anything about their desire to conceal is unfortunately part of the factual record in the pending case of State of Arizona v. Taunau-Ottom Nation, which is currently in the District Court of Arizona, and is a lawsuit based on sort of the bad faith and violation of the compact. But while the nation held this land, even though there's no standard I'm aware of. How many suits are there? There's one you say where there's now a petition for rehearing. Yes, Your Honor. There's this case, and there's another case. There was a State court case over whether Glendale had previously annexed two blocks of land that were included in the nation's property. And then there is a district court case, which is the State, the Gila River Indian Community, and the Salt River-Pima-Maricopa Indian Community suing the nation with respect to the compact in Agra. And what is the relief sought in that case? An injunction that the nation is not allowed to conduct gaming in Phoenix. And that the Gila Bend Act is not settlement of a land claim such that it's an exception for gaming. Is that what? I'm sorry. That the Gila Bend Act is not settlement of a land game for purposes of an exception to Agra for gaming. But to return to the timing, Your Honor, for six years. Before you do that, can I ask you this? I'm looking at the Act, and I mean 2534. And as I look at this, section A1, it talks about the land in question that's covered by the Act has the – has to be ordered on three sides. And then it says, if the landlord has submitted a request to the federal government to take ownership of the territory or hold the territory in trust, can you think of any circumstances where that could possibly apply? Except in one like the one here where you've got the Secretary of the Interior been asked to certify under the Gila Bend Act. Your Honor, there are discretionary Indian land acquisitions under other acts. There are also – and I'm sorry, I don't have the citation to the CFR or to the U.S. Code, but there are land swaps where the federal government exchanges land. Usually it's exchanging mining land for more nationalized land. And you believe that this language would fit those as well? I believe that at some point there would need to be a formal request that would trigger the statute. Although I suspect those lands would not. Have you ever heard of one before? I have not heard of one that would occur within a county island like this. Is there any currently pending that you're aware of? Well, Your Honor, under the Gila Bend Act, the nation has the right to acquire more parcels. Right. I could try this again. And – That's the same problem. What I'm asking is, is there other land that involves any other tribe, any other circumstances that would fit? What I've tried to narrow down is that this Act was passed for only one purpose, and that was to stop this land being taken into trust. Well, Your Honor, I have two responses to that. Okay. And the first is that there are other tribes that could acquire land in fee and ask to have it taken into trust under discretionary statutes. And the second response is that it's not the purpose of the State law that matters for preemption analysis. It's exclusively the effect of State law that matters for preemption purposes like this. And when Congress made eligibility turn on the question of State law, they necessarily knew that State law could be subject to change and that, in fact, annexation could defeat one of these claims. And, Your Honor, if you look to what might happen without HB 2534, such as the city of Glendale had attempted to annex the parcel in 2007 before the nation applied and the nation then responded by applying, would it stay, those annexation proceedings? Did Congress intend to completely preempt all annexation of land? I think they needed to speak much more clearly if they did. And, Your Honor, I'd like to give my colleague just a couple of minutes to respond to constitutional issues. I can tell she's anxious to get up. Thank you, Your Honor. Good morning, Your Honors. I'm Audrey Moe. I represent the city of Glendale. And my task is to address the cross-appeal issues, but they haven't really come up thus far. So I certainly want to answer any questions the panel has about those issues. But I'm not sure we can't just submit those on the briefs. We believe, of course, that the district court appropriately ruled against the Tohono O'odham Nation on its various constitutional, Federal and Arizona constitutional claims. Can you represent as an officer of the court that the city of Glendale's involvement in this litigation, and indeed the companion litigation, had any purpose other than to stop this tribe from acquiring this land and having it become part of the Federal Trust? Certainly, Your Honor. The city of Glendale has been trying mightily for a long time to prevent the trust acquisition from going forward, because in its view that acquisition would cause a very, very significant governmental conflict. Okay. But you're going around the circle. What I'm asking you is to get to the point of this statute. In this case, we are defendant that the Nation sued us and the State of Arizona with respect to HB 2534. I certainly would not deny that the city of Glendale participated as a member of the public in as a proponent of the bill. But I would say this. I think one topic, Your Honor, has come back to. Whether city council meetings or other community meetings that are reflected in the record where the drums against this acquisition were being beaten and people encouraged in the legislature to file this legislation. I believe that the city of Glendale first became you know, I'm not entirely sure whether the city of Glendale was a drafter of the legislation or just a proponent  It has had two iterations. There was an earlier attempt to pass it prior to the time that the district court had issued any ruling with respect to Parcel 2. That effort was unsuccessful and legislation was reintroduced in the following legislative session. Obviously, a bill of the Arizona legislature must be sponsored by a member of the Arizona legislature. And I confess, I just don't know the details of how it came about. But I do want to make, I do want to raise one issue. Your Honor has raised several points this morning that go to really the situation with respect to Parcel 2. Parcel 2 is a parcel where the Department of Interior issued a decision. There has been a district court action with respect to it. There has been an appeal of that decision. Parcel 2, and most importantly, there is a stay that is precluding the city of Glendale from taking any action with respect to Parcel 2, just as the United States has precluded from transferring the trust. Parcel 2 is an animal unto itself. But the Gila Bend Act and other potential actions by other actors in the State of Arizona could come into play in other circumstances where HB 2534 is and would be an appropriate tool to protect existing municipalities in populated areas of Arizona from the kinds of special burdens that occur only when land moves from private ownership to ownership by a sovereign, a sovereign that displaces State and local control and influence over that parcel. So in our view, HB 2534 is an important tool for the future. And it's an important tool with respect to other county islands of which there are many, many, many in the populated areas of Arizona. This is a tool that allows the local government and the residents, citizens of Arizona who have investments in housing, in school districts, in public infrastructure, it protects all those folks from having their voice utterly displaced by the movement in of another sovereign. And so this is a special law, special not in the special legislation context, but special in this governmental context of transfer to sovereigns that addresses a narrow circumstance narrowly, and we think quite fairly. There are very important interests at stake that are or should be equal in the law to whatever interest the Tohono O'odham Nation has in replacing reservation lands in Arizona. Thank you, counsel. I'd just like to clarify a couple of procedural points. Mr. Heller mentioned the claims that the State has brought against the Nation in separate litigation alleging that the Nation cannot game on this property pursuant to the State Tribal Gaming Compact. I just want to be clear, that has nothing whatsoever to do with this case. This case is about whether Glendale, by annexing the land, can block it from being taken into trust. The question whether the Nation can game on the land is a completely distinct question that's being addressed in distinct litigation. I'd also like to say I think, just to be clear, there should be no difference here between the analysis of Parcel 2 and the analysis of the remainder of the settlement property. The Department of the Interior's decision applies equally to the remainder of the settlement property, and so there should be no distinction in the analysis. I will say just one word about the constitutional claims. Judge Smith, you asked whether if the Court rules for us on preemption, it's necessary to reach the cross-appeal. I think the answer to that is no. If for some reason the Court were not to agree with us on preemption, the statute nonetheless violates equal protection. It violates the Arizona Constitution's prohibition on special legislation. And it violates due process as a retroactive law. And all of that is true for many of the same reasons that the statute is preempted. But just to be sure, I understood your question. You said no. You're saying that from the perspective of the tribe, that if this Court were to find that HB 2534 is preempted, that we need not reach or deal with those other issues because the statute's gone. Is that correct? I believe that's correct, yes. Yes. In a sentence, I mean, the reason this statute violates equal protection is that it has no legitimate legislative purpose. Even under rational basis review, the classifications in this statute simply are too narrow to relate to any of the legitimate purposes that the State has hypothesized. They can only rationally be related to the actual purpose which the legislature laid out, which is to block the trust acquisition that the nation would otherwise be authorized to have made under Federal law. If you don't have the preemption problem, though, isn't Judge Campbell correct that there was a rational basis for enacting this, even if it was to block this? Well, I mean, if the Court were to conclude that, you know, blocking the nation from having this land taken into trust at this late date, years after the Secretary has decided to take it into trust, is a legitimate governmental purpose, then that would also dispose of the equal protection claim. Your opponent claimed that the Secretary had made no decision when the bill was enacted, if I understood incorrectly. Do you agree with that? I don't. I'm pretty sure that's incorrect. I mean, I believe that the State Act was 2011. Correct. Correct. So in fact, your opposing counsel was mistaken in that perspective. Yes. I'm not sure if that's what Mr. Hiller intended to say. But the chronology is that the nation's application was filed in 2009. The Secretary's decision was in 2010. This law was passed early in 2011. Right. So the law was after the Secretary made his decision. Correct. Okay. Well, I see my time has expired, unless the panel has further questions. Thank you. Thank you, counsel. Thank you all. The case is there. It will be submitted.
judges: Nelson, Reinhardt, Smith